```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA
```

```
WILLIAM L. ROBERTS              :         CIVIL ACTION
                                :
          v.                    :
                                :
LINCOLN NATIONAL CORPORATION    :         NO. 13-6235
```

MEMORANDUM

Bartle, J.                                         December 19, 2014

        Plaintiff William L. Roberts ("Roberts") brings this six-count action asserting claims of unlawful employment practice under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., under 42 U.S.C. § 1981, and under the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. Ann. §§ 951 et seq., against defendant Lincoln National Corporation ("Lincoln"). Roberts, who is African-American, was formerly employed by Lincoln as the Director of Risk Management. He alleges that he faced disparities in compensation and promotion as a result of race discrimination and that when he complained about it, he was subject to discipline and other adverse actions in retaliation. Roberts also avers that his termination was retaliatory in nature.

        Now before the court is the motion of Lincoln for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

I.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Rule 56(c) states:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials; or ... showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c).

A dispute is genuine if the evidence is such that a reasonable factfinder could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). Summary judgment is granted where there is insufficient record evidence for a reasonable factfinder to find for the plaintiffs. Id. at 252. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id.

When ruling on a motion for summary judgment, we may only rely on admissible evidence. See, e.g., Blackburn v. United Parcel Serv., Inc., 179 F.3d 81, 95 (3d Cir. 1999). We view the facts and draw all inferences in favor of the nonmoving party. In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004). However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990).

II.

The following facts are undisputed or viewed in the light most favorable to Roberts. Lincoln, a holding company that owns and operates a number of insurance and retirement-related businesses, hired Roberts in October 2001 as an Assistant Risk Manager in its Finance Department. He reported to Bruce Boehmke, who was a Second Vice President and the Director of Risk Management.[1] The function of the Risk Management team at Lincoln was in part to determine Lincoln's own insurance needs and to ensure that it obtained the appropriate coverage at the lowest price. Boehmke, who is Caucasian, had accrued nearly twenty years

---

[1] It appears that officer titles are separate from and parallel to specific position titles at Lincoln. Thus, an Assistant Vice President might be an Assistant Risk Manager or the Director of Risk Management, while the Director of Risk Management might hold the officer title of Assistant Vice President or Senior Vice President.

of experience with the company when he retired in August 2006.  In the meanwhile Roberts had been made a corporate officer and was named an Assistant Vice President.  He was promoted from Assistant Risk Manager to Director of Risk Management upon Boehmke's retirement, but was not named as a Second Vice President.  Lincoln had previously decided to eliminate the Second Vice President position as part of a broader corporate reorganization predating Roberts' promotion.  However, existing Second Vice Presidents were permitted to retain their titles.

When Boehmke retired, his annual salary was $183,239.  Roberts was paid $125,000 per year when he took over as Director of Risk Management.  He requested a raise, pointing to a national survey that put the average salary of those in comparable positions at $248,557.  Lincoln's human resources team performed a review of market data in response to the information Roberts submitted and decided to increase his salary by 8.3%.  Roberts also received merit-based increases in his pay over time.  At the time of his termination, his annual salary was $154,629.28, nearly $30,000 per year less than Mr. Boehmke's final salary level but in the top fifteenth percentile for Assistant Vice Presidents companywide.

Through the time of his hiring and his first five years as Director of Risk Management, Roberts had consistently received positive performance reviews.  He also had an unblemished behavioral record at Lincoln.  However, in November 2011 Roberts

was issued a verbal warning with regard to $150 in travel reimbursements that were found to be personal expenses.  He was admonished to be more careful in the expenditure and accounting of funds in the future.  Another Finance Department employee was eventually terminated as a result of the same investigation.

Roberts believed that this investigation and verbal discipline was consistent with a pattern of discrimination that he had faced starting with the pay disparity between him and Boehmke.  He stated as much in a response to the verbal warning and separately to Lincoln's Human Resources Department.  When it appeared that Human Resources would take no action on his complaint, Roberts filed his first charge with the Equal Employment Opportunity Commission on May 11, 2012.[2]  Lincoln was served with the charge in June, and the company's Law Department undertook to defend it.

On August 31, 2012, Lincoln transferred the Risk Management team consisting of Roberts and his assistant from the Finance Department to the Law Department.  At this time Lincoln was undertaking a company-wide reorganization effort called Project Simplify.  It required all department heads to reduce the layers of management from eleven to seven.  As part of that effort, Adam Ciongoli, Lincoln's newly hired General Counsel, decided it would

---

[2]  It is disputed whether the Human Resources Department did, in fact, investigate Roberts' claim.

make sense for the team handling the company's insurance coverage to work within the Law Department which deals with ongoing and threatened litigation.  Ciongoli also had significant risk management experience in his previous employment.

While the Risk Management function had been a part of the Finance Department for upwards of thirty years, it was transferred to the Law Department as part of Project Simplify. Roberts reported to Kelley Grady, an attorney in the Law Department.  Grady, in turn, reported to Ciongoli.  While she was not in charge of handling Roberts' pending EEOC charge, she was aware of the claim at the time of his transfer to her team.

Roberts asserts that his transfer to the Law Department, which was actively handling his EEOC charge at the time, took place in retaliation against his complaint.  Indeed, his experience in the Law Department was dramatically different from his preceding eleven years at the company.  According to Roberts, Grady subjected him to excessive micromanagement that was not in keeping with his lengthy experience and status as an officer of Lincoln.  She required that he meet with her on a weekly basis, but she did not ask for such meetings with other employees who reported to her. Furthermore, Grady terminated Roberts' assistant without notifying him in advance.

Grady and Roberts were also frequently at loggerheads over his travel.  She asked him to justify any travel expenses.  As

a cost-cutting measure, she also insisted that third-party insurance brokers seeking Lincoln's business should come to him rather than the other way around as was Roberts' previous practice.

Roberts received poor performance evaluations from Grady after his transfer to the Law Department. Among other deficiencies, Roberts was cited for acting confrontationally in resisting Grady's attempts at managing his travel and for failing adequately to prepare an important presentation to be given to the uppermost levels of Lincoln's management. He also commented on pending litigation with an outside insurance broker in an email.

Lincoln had undertaken a critical review of its relationships with outside vendors. It had particular concern about Roberts' email and incidents in which he had inappropriately familiar communications with third parties. Ciongoli has explained that these assessments of Roberts' performance stemmed from Ciongoli's mandate to identify waste and increase efficiency. These evaluations of Roberts stood in stark contrast with the eleven years of positive performance reviews he had previously earned before the filing of his EEOC charge.

As a result of these performance reviews and Roberts' resistance to the efforts of Grady, she issued to him a Final Formal Written Warning on January 18, 2013. After consulting with Ciongoli, Grady explained in this warning that Roberts had been argumentative and insubordinate towards her, that he would need to

-7-

send a daily list of his major activities going forward, and that he would be precluded from applying for any internal open positions for thirty days as a punishment. Roberts vigorously contested the conclusions of the warning and informed Grady in writing that he felt it was an effort to retaliate against him for filing his EEOC charge.

Two months later, in March 2013, Grady gave Roberts a poor performance evaluation for 2012. In doing so, she did not consult with Roberts' previous supervisor in the Finance Department who had observed his performance for eight months of the year in question. She also retroactively applied newly established 2013 performance criteria for Roberts' performance in the preceding year, which Roberts felt was an unfair method of assessment. As a result of this evaluation, Roberts received no pay raise, and his bonus was reduced.

In early May 2013, Lincoln had invited a group of insurance brokers to bid on its corporate insurance programs as part of its continuing effort to evaluate costs and its preexisting relationships with outside vendors. Lincoln's current broker, Aon, was among those presenting bids. Ciongoli became very concerned about Roberts' job performance because he rated Aon's presentation the highest of the group when the other brokers and Ciongoli himself had all identified severe, material deficiencies in Aon's

presentation.[3]  Roberts also asked questions during the presentation that supposedly betrayed a lack of basic understanding of the insurance products that he was tasked with assessing.

Shortly after the presentation process concluded, Ciongoli sent Roberts an email stating that his confidence in Roberts had been fatally undermined.  This incident, along with previous instances in which Roberts had purportedly demonstrated inappropriately close relationships with third parties and his declining performance overall, convinced Roberts' superiors that he was not fit for his position.  In a May 2013 email exchange, Ciongoli and Grady agreed that Roberts would be terminated as soon as a replacement could be found.  Roberts was not informed of their decision at that time.

Roberts filed a second EEOC charge on June 26, 2013 alleging that the final warning he received from Grady in January was retaliatory.  On September 5, 2013, roughly two-and-a-half months after filing this charge, Roberts was terminated.  Lincoln had yet to find a replacement for him but claims that his performance had deteriorated so egregiously that it had no choice but to end the employment relationship.

---

[3]  Aon's managing principal went so far as to email Ciongoli several days after the presentation to apologize for its poor quality and to request another chance to compete for Lincoln's business.

In his complaint, Roberts asserts in Counts I, II, and III that the pay disparity between him and Boehmke is a result of unlawful race discrimination.[4] In Counts IV, V, and VI, he contends that his transfer to the Law Department and the actions of Lincoln against him that followed were done in retaliation for filing his EEOC charges.

### III.

To begin our analysis of Roberts' claims of race discrimination and retaliation, we set forth the burden-shifting framework provided in McDonnell Douglas Corp. v. Green, which controls cases of race discrimination and retaliation under Title VII, § 1981, and the PHRA. 411 U.S. 792, 802 (1973); Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999); Fenter v. Mondelez Global, LLC, 574 F. App'x 213, 218 (3d Cir. 2014); Marra v. Phila. Housing Auth., 497 F.3d 286, 300 (3d Cir. 2007). The plaintiff bears the initial burden of making out a prima facie case. To challenge the plaintiff's prima facie case, the defendant must come forward with legitimate, non-discriminatory reasons for its actions. McDonnell Douglas, 411 U.S. at 802. If the defendant succeeds in doing so, the plaintiff has the next move. In order to survive the defendant's motion for summary judgment, "the plaintiff

---

[4] Roberts also alleges in his complaint that the failure to promote him to Second Vice President or its equivalent was the result of race discrimination. However, the parties now agree that this assertion is no longer a part of the case.

-10-

must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).  At all times, the plaintiff retains the burden of proof on his claim.  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

### IV.

In light of this burden-shifting framework, we first address Roberts' claim of race discrimination with respect to the pay disparity between him and his previous supervisor, Bruce Boehmke.  To establish a prima facie case of race discrimination for disparate treatment of this sort, a plaintiff must come forward with evidence that he or she was performing work substantially equal to that of an employee of another race who was compensated at a higher rate than the plaintiff.  Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1087 (3d Cir. 1996).  Roberts, who is African-American, held the same position and duties as his predecessor, Bruce Boehmke, who is Caucasian.  Boehmke was paid $183,239 per year at the time of retirement, which is significantly greater than the $154,629.28 per year that Roberts was receiving at the time of his termination.  Roberts has thus made out a prima facie case of race discrimination.

The burden of production therefore shifts to Lincoln to provide legitimate, nondiscriminatory reasons for this pay disparity. McDonnell Douglas, 411 U.S. at 802. Lincoln has given several reasons for the difference in income between Boehmke and Roberts. First, Boehmke had nearly twenty years of experience at Lincoln when he retired and had been the Director of Risk Management for his entire tenure, whereas Roberts had been with Lincoln under twelve years at the time of his termination and was newly promoted to Boehmke's position in 2006. Second, Lincoln explains that Roberts was paid in the top fifteenth percentile of the pay scale for Assistant Vice Presidents. We note that the survey information that Roberts relied upon in requesting a salary of over $248,000 is inadmissible hearsay which cannot be considered in deciding a motion for summary judgment. Blackburn v. United Parcel Serv., Inc., 179 F.3d 81, 95 (3d Cir. 1999). Lincoln has come forward with legitimate, non-discriminatory reasons for its decision to fix Roberts' salary at the level it did.

As a result, the burden shifts back to Roberts to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). To meet this burden Roberts merely explains that if his

-12-

entire work history is taken into account, "both [he and Boehmke] had about 30 years of experience in corporate insurance and risk management jobs" and they had equivalent educational and licensing credentials.

Taking this assertion as true, it is nonetheless insufficient evidence from which a factfinder could reasonably disbelieve Lincoln's articulated reasons or otherwise conclude that the pay disparity was caused by racial discrimination.[5] It is undisputed that Boehmke had been an employee of Lincoln for over nineteen years at the time of his retirement, all of which he spent as the Director of Risk Management. Roberts, on the other hand, had slightly less than five years of experience at Lincoln when he took over Boehmke's position and just under twelve when he was terminated. If there is no other evidence of unlawful discrimination, it is legitimate for a company to reward an employee for accumulated experience and longevity at a high level of responsibility. Cf. 42 U.S.C. § 2000e-2(h). Roberts has not come forward with any evidence to suggest that the difference in pay

---

[5] We note that Boehmke started in the risk management field approximately eleven years before Roberts. In 2006 when he retired, Boehmke had thirty-two years and ten months of experience in risk management, while Roberts had twenty-two years and seven months of experience at that time. Roberts had twenty-nine years and seven months' experience at the date of his termination. These differences significantly hinder an accurate comparison of Boehmke's and Roberts' levels of experience.

-14-

between him and Boehmke was a result of anything other than these legitimate, nondiscriminatory reasons. Summary judgment will be granted in favor of Lincoln and against Roberts on his discrimination claims, Counts I, II, and III of the complaint.

V.

We turn to Roberts' claims of retaliation, which are set forth in Counts IV, V, and VI. On these claims, having carefully reviewed the arguments of the parties and the relevant records, we conclude that genuine disputes of material fact exist for the jury to resolve at trial. Accordingly, the motion of Lincoln for summary judgment will be denied with respect to Roberts' retaliation claims.